## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Kimberly Hill Kidd, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the FBI and have been since February 2002.  As such, I am a federal law enforcement officer authorized to investigate violations of federal law and to apply for and execute warrants issued under the authority of the United States.  I investigate various federal crimes, including those involving child pornography and child exploitation. Before becoming a Special Agent, I was a Psychological Associate for a private counseling practice for seven years, where I specialized in providing counseling to preteen and teenage girls. I have extensive law enforcement training in child exploitation crimes, and most of my caseload consists of child exploitation crimes involving the internet and computer equipment.  I have attended numerous in-services, trainings, and have completed on-line training in relation to computer crimes against children and computer crimes in general.

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search electronics seized pursuant to a search warrant obtained and executed by Richmond Police Department at the residence of Ryan McConnaughey and items obtained by consent from the fiancé of Ryan McConnaughey, further described in Attachment A, which was seized on or about November 13, 2021, from 241 McDaniel Avenue, Apartment #4, Richmond, Kentucky 40475, which is in the Eastern District of Kentucky, for the things described in Attachment B.  The items to be searched are described in the following paragraphs and in Attachment A and is currently in the custody of the FBI at 1648 McGrathiana Parkway, Suite 250, Lexington, Kentucky 40511, which is in the Eastern District of Kentucky. This affidavit is made in support of an application for a search warrant

under 18 U.S.C. § 2251(a)(2), 18 U.S.C. § 2252(a)(2) and 18 U.S.C. § 2252(a)(4) (B) further

described in Section I of Attachment B.  Upon receipt of the items described in Attachment A

and Paragraph 1 of Attachment B, government authorized persons will review those items to

locate the information described in the remainder of Attachment B.

  3.  The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set

forth all my knowledge about this matter.

## **STATUTORY AUTHORITY**

  4.  This investigation concerns alleged violations of Title 18, United States Code,

§§2251 and 2252, relating to material involving the sexual exploitation of minors:

  a. 18 U.S.C. § 2251(a) prohibits a person from employing, using, persuading, inducing, enticing, or coercing any minor to engage in, or to have a minor assist any other person to engage in, or to transport any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct.

  b. 18 U.S.C. § 2252(a)(2) prohibits a person from knowingly receiving or distributing any visual depiction using any means or facility of interstate or foreign commerce or that has been mailed, or that has been shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails, if (i) the producing of such visual depiction involves the use of a minor engaged in sexually explicit conduct; and (ii) such visual depiction is of such conduct.

  c. 18 U.S.C. §2252(a)(4)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view any material that contains a visual depiction of a minor engaging in sexually explicit conduct and such visual

2

depiction is of such conduct, that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

5.      The following definitions apply to this Affidavit and its Attachments:

a.    The term "minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

b.    The term "sexually explicit conduct," 18 U.S.C. § 2256(2)(A)(i-v), is defined as actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic areas of any person.

c.    The term "visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

d.    The term "computer," as defined in 18 U.S.C. §1030(e)(1), means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

e.    "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users.  A web server, for example, is a computer which hosts the data associated with a website.  That web server receives requests from a user and delivers information from the server to the user's computer via the Internet.  A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

3

f.   "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g.   "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h.   "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

i.   "Computer passwords, pass-phrases and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password or pass-phrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

j.   "Digital camera" can be a standalone camera or be embedded into a Smartphone. This device records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a

4

screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

k.  "GPS" is a navigation device that uses the Global Positioning System (generally abbreviated "GPS") to display its current location.  A GPS can either be a standalone device or it can be embedded into a Smartphone.  It often contains records of the locations where it has been.  Some GPS navigation devices can give a user directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

l.  The term "child pornography," as defined in 18 U.S.C. § 2256(8), means any visual depiction, including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct. This is also referred to as child sexual abuse material.

m.  The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), SD cards, MicroSD cards, memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data

5

files and printouts or readouts from any magnetic, electrical or electronic storage device).

n. The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

o. "Internet Service Providers" (ISPs), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

p. "Internet Protocol address" (IP address), as used herein, is a code made up of numbers separated by dots that identifies a particular computer on the Internet. Every computer requires an IP address to connect to the Internet.  IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. IP addresses are listed in one of two formats: "IPv4", which is the older version of IP addresses, and IPv6, which is the newer version of IP addresses.

q. "Domain names" are common, easy to remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.

r. "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

s. The term "Social Networking Site" is used to describe applications or websites which focus on establishing networks or relationships among individual users based on interests or activities.

t. "Portable media player: is either a handheld digital storage device ("MP3 Player" or iPod for example) or an application embedded in a Smartphone, which is designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data.  Some portable

6

media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

u. "Smartphone" means a combination of a mobile phone / cellphone and a handheld computer that works off mobile networks and/or Wi-Fi, or a wireless connection. A smartphone can do everything a personal computer can do, and because of its mobility, sometimes more. A smartphone is a mobile phone with highly advanced features. A typical smartphone has a high-resolution touch screen display, Wi-Fi connectivity, Web browsing capabilities, and the ability to accept sophisticated applications. Most of these devices run on two popular mobile operating systems, Android or iOS. Almost all smartphones now run on processors with high processing speeds coupled with low power consumptions. That means they allow you to play games, browse the Web, update your social media accounts (i.e. Facebook, Instagram, Twitter), make phone calls, send/receive text messages, take pictures, make videos, and even compose word documents directly on the device. A smartphone is always generally with reach. Like with a traditional computer, smartphones have the ability to download and run hundreds of thousands of mobile applications.

v. "Tablet" means a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

w. Wireless telephone" (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text

7

messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO ACCESS WITH INTENT TO VIEW AND/OR RECEIVE CHILD SEXUAL ABUSE MATERIAL

6.    Based on my previous investigative experience related to child sexual abuse material investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who utilize chat rooms, instant messaging apps, and social media sites to target minors for the purpose of obtaining, through various means, images of child sexual abuse material:

a.    Individuals who access with intent to view and/or receive child sexual abuse material may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.    Individuals who access with intent to view and/or receive child sexual abuse material may collect sexually explicit or suggestive materials, in a variety of media, including photographs, digital images and videos, magazines, motion pictures, books, and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts or to refresh their memories of prior sexual child abuse activities they have committed.

c.    Individuals who access with intent to view and/or receive child sexual abuse material almost always possess and maintain their original copies of child pornographic material, that is, their pictures and videos in the privacy and security of their home, person, vehicle, workplace, or some other secure, web-based or cloud-based, location. Individuals who have a sexual interest in children or images of children typically retain pictures, videos, films, photographs, magazines, correspondence, books, mailing lists, and child erotica for many years. Many of these collections can be found on external media storage devices that are easily concealed in the home, a vehicle, or the workplace, away from family members or co-workers who could stumble upon the

collection.

d.       Likewise, individuals who access with intent to view and/or receive child sexual abuse material often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer, web-based program, cloud-based program, or secure third-party application on a mobile device or computer. These collections are often maintained for several years and are kept close by. Physically they can be kept at the collector's residence, a storage building(s) or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly. Digitally they are kept on the device(s) the individual has on their person the most, or a device only they know the password to.  Many traders and collectors of child sexual abuse material will ensure their collection, or at least part of their collection, is in a location they have frequent or easy access to and maintain "eyes on" the collection at all times.  In your affiant's training and experience, collectors of child sexual abuse material will either have a location in their residence, in their personal vehicles, or at work, where they maintain their non-cloud-based collection.

e.       Individuals who access with intent to view and/or receive child sexual abuse material also may correspond with and/or meet others to share or trade information and materials. They rarely destroy correspondence from other child sexual abuse material distributors/collectors. They conceal such correspondence as they do their sexually explicit material. They often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child sexual abuse material. Sometimes these lists are kept physically, but in more and more cases, the lists are maintained on a mobile or electronic device, or within an application or web-based program (like a friends list on a social media application).

f.       Individuals who access with intent to view and/or receive child sexual abuse material also can, and will, maintain a separate mobile device for their collection, storage, and correspondence regarding child sexual abuse material.  These devices are usually kept hidden from family members, partners, and co-workers, in locations either only the collector has access to, or location others have limited access to (for example, an outbuilding, workshop, file cabinet drawer, vehicle if each member of the family has their own, or locked safe).  These locations can also be storage locations for any external devices (mentioned above) that may contain a collection.

g.       Individuals who access with intent to view and/or receive child sexual abuse material prefer not to be without their child sexual abuse material for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child sexual abuse material throughout the world.

## BACKGROUND ON ELECTRONIC DEVICES AND CHILD SEXUAL ABUSE MATERIAL

7.      I have had both training and experience in the investigation of electronic device-related crimes.  Based on my training, experience and knowledge, I know the following:

8.      Electronic devices, cellular phones, and digital technology have dramatically changed the way in which individuals interested in child sexual abuse material interact with each other.  Electronic devices, including cellular phones, basically serve four functions in connection with child sexual abuse material:  production, communication, distribution, and storage.

9.      In the past, technology for the transfer of child sexual abuse material images consisted of individuals transferring printed photographs into a computer-readable format with a device known as a scanner.  Now, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer.  In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper.  Photos taken on a digital camera are either stored on a removable memory card in the camera, which store up to, or even over, 64 gigabytes of data, equivalent to hundreds of thousands of high-resolution photographs, or the camera is Bluetooth or Wi-Fi capable so the images can be transferred directly to another device, or directly into a social media account on the internet.  Video camcorders, which once recorded video onto tapes or mini-CDs, are now just video cameras that can save video footage in a digital format directly to a hard drive embedded in the camera, or onto a transferable media storage device like a SD card.  Some video cameras now even have Bluetooth or Wi-Fi capabilities so they can transfer the image directly to another device, or directly into a social media account on the internet.  For the old camcorders, the video files can be easily transferred from the camcorder to a computer via a cable that comes with the camcorder.  Now, all Smartphones come with a digital camera

10

embedded into the device itself.  The resolution on some of the embedded cameras on

Smartphones can be of a higher resolution than portable digital cameras.  The digital camera

embedded in a Smartphone can save the image directly onto the device, into a specific folder on

the device, to a third-party application installed on the Smartphone, to a media storage card

inserted into the Smartphone, or the image can be directed to transmit to an external device via

wireless or Bluetooth connectivity between the Smartphone and the selected external device.

   10. A device known as a modem allows any computer to connect to another computer

through a telephone, cable, or wireless connection (Wi-Fi).  Electronic contact can be made to

literally millions of computers around the world.  The ability to produce child sexual abuse

material easily, reproduce it inexpensively, and market it anonymously (through electronic

communications) has drastically changed the method of distribution and receipt of child sexual

abuse material.  Child sexual abuse material can be transferred via electronic mail, through file

transfer protocols (FTPs), through Peer-to Peer software, and through social media applications,

to anyone with access to a computer, laptop, tablet, Smartphone, and a modem.  Because of the

proliferation of commercial services that provide electronic mail service, chat services (i.e.,

"Instant Messaging", "Direct Messaging", cloud-based messaging services, etc.), social media

sites, free applications for Smartphones and tablets, all with easy access to the Internet, the

computer, laptop, tablet, and Smartphone is a preferred method of production, distribution and

receipt of child sexual abuse materials.

   11. The computer's, laptop's, tablet's, and Smartphone's ability to store images in

digital form makes these devices themselves an ideal repository for child sexual abuse material.

The size of the electronic storage media (commonly referred to as the hard drive) used in all

forms of electronics has grown tremendously within the last several years.  These drives can

store hundreds of thousands of images at very high resolution.  In addition, there are numerous options available for the storage of computer or digital files.  One, two, and even four-Terabyte external and internal hard drives are not uncommon in today's computers and laptops.  Other media storage devices include CDs, DVDs, "thumb," "jump," or "flash" drives, and external hard drives, which are very small devices that are plugged into a port on the computer, smartphone, laptop, or tablet.  It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, smartphone, laptop, and tablet, and then copy it (or any other files on the device) to any one of those media storage devices. Media storage devices are constantly being made smaller and smaller in size, and also being made to look like everyday items, that they can easily be concealed and carried on an individual's person (like on a key ring, in a purse or wallet, or on a belt buckle).

12.     The Internet affords individuals several different venues for obtaining, viewing, and trading child sexual abuse material in a relatively secure and anonymous fashion, including the traditional "Web" and the "Dark Web" or Tor browsers.

13.     Individuals also use online resources to retrieve and store child sexual abuse material, including services offered by Internet Portals such as Yahoo!, Google, and Hotmail, among others, as well as third-party cloud-based storage applications like Dropbox and Vault. The online services allow a user to set up an account with a remote computing service that provides e-mail services, direct messaging, as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Even in cases where online storage is used, however, evidence of child sexual abuse material can be found on the user's computer, smartphone, laptop, tablet, or external media in most cases.  All Smartphones now come with the option to have the phone's data

systematically updated to a provider's cloud storage.  All iPhones can back up a phone's data to iCloud Storage and all Android phones can back up the phone's data to Google Cloud Storage. This automatic backup also can back up some third-party applications.  But most third-party applications, once installed on a mobile device, will keep the individual's contents on one of their own servers, located elsewhere. Some third-party applications allow for special storage on the user's device through their application. While the third-party application can see there is data, the data is encrypted on the application's servers and can only be viewed on the user's device through a special portal or passcode.

14.     As is the case with most digital technology, communications by way of electronic device can be saved or stored on the device used for these purposes.  Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.  Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  Such information is often maintained indefinitely until overwritten by other data.

## BACKGROUND INFORMATION ON HASH VALUES, PHOTODNA AND CEI

15.     Your Affiant knows from training and experience that "CEI" is an abbreviation for Child Exploitation Imagery, which includes child sexual abuse material and child pornography.

16.     Your Affiant also knows from training and experience that PhotoDNA is a technology that aids in finding and removing known images of child exploitation. PhotoDNA was developed by Microsoft and is currently used by organizations and law enforcement around the word to assist in the detection, disruption and reporting of child exploitation imagery. According to Microsoft's PhotoDNA website (https://www.microsoft.com/en-us/photodna), PhotoDNA creates a unique digital signature (known as a "hash") of an image which is then compared against the signatures (hashes) of other photos to find copies of the same image. PhotoDNA can be compared to databases containing hashes of previously identified images of child exploitation.

17.     Your Affiant knows from training and experience that, "A hash value is an alphanumeric sequence that is unique to a specific digital file.  Any identical copy of the file will have exactly the same hash value as the original, but any alteration of the file, including even a change of one or two pixels, would result in a different hash value.  Consequently, once a file has been 'hashed,' a suspected copy can be determined to be identical to the original file if it has the same hash value as the original, and not to be identical if it has a different hash value." *United States v. Keith*, No 11-10294 (D.Mass, Nov. 5, 2013), 2013 WL 5918524 at 1.

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

18.     On November 13, 2021, Richmond Police Department responded to a 911 call at the home of Misty Rosenau.  Rosenau was reporting that she had discovered videos of her fiancé, Ryan McConnaughey, exposing himself to minors online, via video chat, and that some of the minors exposed themselves to McConnaughey. Rosenau and McConnaughey have been romantically involved for years, lived together in the same household, and have two children

14

together.  Prior to Rosenau calling Richmond Police to the residence, Rosenau had access to all electronics in the apartment she shared with McConnaughey.  Rosenau had all of the passwords to the electronic devices, as well as passwords to the email accounts and other social media platforms utilized by McConnaughey.

19.     On the morning of November 13, 2021, Rosenau noticed McConnaughey was remotely logging into the home laptop from his work computer, located at the Quality Inn in Richmond, Kentucky.  Rosenau had observed McConnaughey reviewing videos of females, who looked to be as young as 10 years old, exposing themselves during video chats with McConnaughey.  Rosenau called McConnaughey on his cell phone to confront him while McConnaughey was at work.  McConnaughey denied the allegations. Rosenau then noticed McConnaughey trying to delete things remotely from the laptop computer.  Rosenau disconnected the laptop from the internet to preserve the data.

20.     Rosenau knew McConnaughey would remotely access the laptops and computer at home, and that he would often use a Virtual Private Network (VPN) and The Onion Router (TOR) to access the internet.

21.     Per Wikipedia, A VPN extends a private network across a public network and enables users to send and receive data across shared or public networks as if their computing devices were directly connected to the private network. The benefits of a VPN include increases in functionality, security, and management of the private network. It provides access to resources that are inaccessible on the public network and is typically used for remote workers. Encryption is common, although not an inherent part of a VPN connection. VPNs cannot make online connections completely anonymous, but they can increase privacy and security. To prevent

15

disclosure of private information or data sniffing, VPNs typically allow only authenticated remote access using tunneling protocols and secure encryption techniques.

22.     TOR is a free and open-source software for enabling anonymous communication. It directs Internet traffic through a free, worldwide, volunteer overlay network, consisting of more than seven thousand relays, to conceal a user's location and usage from anyone performing network surveillance or traffic analysis. Using TOR makes it more difficult to trace a user's Internet activity. TOR's intended use is to protect the personal privacy of its users, as well as their freedom and ability to communicate confidentially through IP address anonymity using TOR exit nodes. TOR enables its users to surf the Internet, chat and send instant messages anonymously, and is used by a wide variety of people for both licit and illicit purposes. TOR is not designed to completely erase tracking but instead to reduce the likelihood for sites to trace actions and data back to the user. TOR is also used for illegal activities. These can include privacy protection or censorship circumvention, as well as distribution of child abuse content, drug sales, or malware distribution.

23.     Rosenau contacted law enforcement about what she saw on the laptop because she believed the adult male exposing himself to minors in the videos appeared to be McConnaughey. Rosenau recognized their apartment in the background of the videos and the shirts the male was wearing were shirts she personally purchased for McConnaughey.  The laptop was on the mail level of the apartment, in plain view of Rosenau.

24.     Officer Daniel Toth of the Richmond Police Department responded to Rosenau's 911 call by going to the home of Rosenau and McConnaughey.  Officer Toth was able to view

16

thumbnails on the laptop screen of videos that, through his training and experience, he believed to be of minor females.  Officer Toth stated the females appeared to be young teenagers.

25.     Officer Toth then observed a computer tower and monitor in the living room of the apartment.  Rosenau identified this to be McConnaughey's main computer.  When Officer Toth asked Rosenau to put this device in airplane mode, Officer Toth and Rosenau both noticed the desktop computer tower being remotely accessed.  Officer Toth and Rosenau both observed an apology being typed, in real time, on the screen.  The tower was placed in airplane mode and the message then stopped.  The message was preserved on the tower by Rosenau.

26.     Rosenau was not aware of any other devices McConnaughey would be using except the laptop, tower, and his phone [which he had with him at his place of work].  Rosenau did not recall seeing McConnaughey using any kind of flash drives or memory sticks recently but stated he had used an external hard drive in the past, maybe several years ago.

27.     While Officer Toth was in the apartment, McConnaughey was texting and calling Rosenau repeatedly.  Rosenau provided copies of the text messages to Officer Toth.  Two particular messages stated, "even if you make me go to jail and everything, I love you all so much" and "I really am not some sicko like you think I am though…"

28.     The following items were seized from the residence at that time: McConnaughey's Black ASUS Laptop Model FX505D Notebook PC s/n L9NRCV00090136A; Rosenau's Black ASUS Laptop Model FX505D Notebook PC s/n L9NRCV00P22037H; and McConnaughey's Computer Tower with blue plastic on front and Dell Power Supply.

29.      Also on November 13, 2021, McConnaughey was interviewed at his place of employment, Quality Inn, 2006 Colby Taylor Drive, Richmond, KY 40475.  McConnaughey admitted there may be pornographic material on his laptop but denied any knowledge of the pornographic material being of minors.  McConnaughey confirmed he does have the ability to remotely access his computers and stated he does this to monitor his crypto-currency. McConnaughey denied a consent to search of his cell phone and requested an attorney. McConnaughey's cell phone was seized at that time.  McConnaughey's cell phone is described as a Blue LG LM-X410ASR Cell Phone, s/n 808VTRG119494, IMEI 357138-09-119494-1.

30.      McConnaughey then was detained and arrested by Richmond Police Department.

31.      On November 13, 2021, Officer Toth obtained a search warrant for the electronics seized from the home of Ryan McConaughey and his person earlier that day.  This search warrant was specifically for: Blue LG LM-X410ASR Cell Phone, s/n 808VTRG119494, IMEI 357138-09-119494-1; Black ASUS Laptop Model FX505D Notebook PC s/n L9NRCV00090136A; Rosenau's Black ASUS Laptop Model FX505D Notebook PC s/n L9NRCV00P22037H; and McConnaughey's Computer Tower with blue plastic on front and Dell Power Supply.

32.      On November 13, 2021, a search warrant was obtained and executed by Officer Toth for the residence of McConnaughey. During the execution of this search warrant, additional electronic items identified by Rosenau as belonging to McConnaughey and specific items of clothing McConnaughey can be seen wearing in the videos observed by Officer Toth during the initiation of the investigation were seized.

33.     After execution of the search warrant, a preview of McConnaughey's laptop was conducted by Officer Toth.  Officer Toth utilized his body camera to record the execution of the search warrant to ensure anything located on the devices was preserved in case there were any fail-safes on the devices, causing them to be wiped during forensic review.

34.     During his preview, Officer Toth located approximately 43 videos that contained CSAM.  The videos are of females ranging in age from approximately 8 years old to 16 years old.  In the videos observed by Officer Toth, McConnaughey does not show his face, nor does he communicate with his microphone. However, the male in the videos is wearing very distinct and identifiable t-shirts. The three following shirts were observed in the videos, along with others:  a black t-shirt that reads, "ZELDA", a black t-shirt that reads, "GAMER BY DAY, DAD BY NIGHT", and a gray t-shirt with a game controlled that reads, "BACK IN THE DAY".

35.     Also on November 13, 2021, a second search warrant was drafted for McConnaughey's residence, to search for the identified clothing, as well as any other electronic devices or obscene material(s).  Items seized as a result of that warrant included the following: Gray Dell OptiPlex GX620 Computer Tower (labeled BDSV9B1 on the back); Black LG Smartphone with cracked screen (unknown model or serial number); White Alcatel Smartphone with AT&T logo on back with broken screen (unknown model or serial number); Black Alcatel Model 6062W Smartphone (lMEI # 015126003690761) with broken screen in silver/black phone case; Black t-shirt that reads "ZELDA" on the front; Navy blue t-shirt that reads "PAC-MAN" on the front; Black t-shirt that reads "DAD BY DAY GAMER BY NIGHT"; and Gray t-shirt that reads "BACK IN THE DAY".

36.     Per Wikipedia, Omegle is a free online chat website that allows users to socialize with others without the need to register usernames. The service randomly pairs users in one-on-one chat sessions where they chat anonymously using the names "You" and "Stranger" or "Stranger 1" and "Stranger 2" in the case of Spy mode. Prior to early 2013, the site did not censor contributions through a profanity filter, and users have reported encountering nudity or sexual content on camera. After January 2013, Omegle implemented a "monitored" video chat, to monitor misbehavior and protect people under the age of 18 from potentially harmful content, including nudity or sexual content. However, the monitoring is not very effective, and users can often skirt around bans. To complement the monitored video chat, Omegle also has an "unmonitored" video chat that is not monitored for sexual content. Omegle and other random chat websites experienced a surge of popularity due to the COVID-19 pandemic. This has also caused increase of minors using the website. Numerous advisories, bulletins and warnings have been issued by both local and state law enforcement, as there have been major increases in reports of cyber-crime involving sexual exploitation of minors occurring on Omegle due to the popularity surge.

37.     In the videos observed by Officer Toth, chat messages between McConnaughey and the minor females are visible.  The videos capture McConnaughey directing the minors to show their vagina, breasts, and buttocks.  In some of the videos, McConnaughey is directing the minors to touch these body parts, and in some of the videos McConnaughey directs the minors to masturbate.  In almost all the videos, McConnaughey asks the females their age and the females respond with an age under 18 years old.

38.     Also located on McConnaughey's laptop were videos memorializing unsuccessful attempts for solicitation of minors and McConnaughey disconnecting from any users on the Omegle platform that were either male or identified themselves to be adults.

39.     In some of the successful solicitation videos, the video memorializes McConnaughey either masturbating or showing his erect penis to the minor.  In at least two of the videos recovered during the preview, McConnaughey ejaculates during the conversation with the minor.

40.     The preview of McConnaughey's laptop also confirmed that McConnaughey successfully accessed the laptop from his place of employment, at a time after Rosenau confronted him.  Data also indicates McConnaughey may have attempted to delete some of the videos, as several of the CSAM videos were recovered from the "Recycle Bin" folder on the laptop.

41.     The date range for the videos recovered during the preview appear to be from the middle of October 2021 to the date of law enforcement contact, November 13, 2021.

42.     On November 15, 2021, Rosenau contacted Officer Toth to indicate she had located an external solid state hard drive in the closet and an additional t-shirt she believed could be needed as evidence.  Officer Michael Martinez of Richmond Police Department collected these items from Rosenau on the same day.  The two items are described as a Black t-shirt with an image of a controller and white lettering "I paused my game to be here" and an Integral SSD 120 GB hard drive (discovered by Rosenau inside of a red bag in their closet on the base floor under the stairs).

21

43.     A forensic report was generated by Richmond Police Department utilizing the basic Cellebrite cellphone forensic tool.  Officer Toth performed a preview of the laptop, but no forensics were conducted on the laptop belonging to McConnaughey.  None of the other items of electronics listed in this affidavit have been forensically examined.

44.     As indicated above, based on my training and experience, individuals who have an intent to produce, distribute, receive and collect child pornography, will use multiple electronic devices to communicate with, and obtain images and videos of child sexual abuse material, from minors.  The website McConnaughey was utilizing to chat and entice minors into engaging in sexually explicit conversations is available through any device that can connect to the internet and has the ability to utilize a web browser.  McConnaughey had screen captures of his on-line chats saved to his desktop.  Many individuals also create back-ups of their collections on devices like thumb drives and external hard drives.  Officer Toth witnessed firsthand McConnaughey accessing his electronics remotely from his place of employment.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

45.     As described above and in Attachment B, this application seeks permission to forensically examine the electronic devices owned and operated by McConnaugey for evidence of his enticement, receipt, and/or possession of CSAM, in whatever form(s) they may be found.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

46.     *Probable cause.*  I submit that there is probable cause to believe those records will be stored on any of those electronic devices, based on the following reasons:

    a.      Based on my knowledge, training, and experience, I know that electronic data files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic

22

files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, an electronic device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, electronic device storage media— in particular, electronic device's internal hard drives—contain electronic evidence of how an electronic device has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Electronic device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet / cellular connection are sometimes automatically downloaded into a temporary Internet directory or "cache."

47.      *Forensic evidence.*  As further described in Attachment B, this application seeks

permission to locate not only data files that might serve as direct evidence of the crimes

described in the warrant, but also for forensic electronic evidence that establishes how the

electronic device was used, the purpose of its use, who used it, and when. There is probable

cause to believe that this forensic electronic evidence will be on the Samsung Galaxy S10e

cellular phone because:

e.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file. Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. If SD cards were used in a cellular phone, information such as history of web browsers, e-mail programs, and chat programs (all of which store configuration information on the storage medium) can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the electronic device was in use. Electronic file systems can record information about the dates files

23

were created and the sequence in which they were created, although this information can later be falsified for nefarious reasons by a subject.

f.      As explained herein, information stored within an electronic device and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within an electronic device or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the electronic device or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the electronic device was remotely accessed, thus inculpating or exculpating the device's owner.  Further, electronic device and storage media activity can indicate how and when the device or storage media was accessed or used.  For example, as described herein, electronic devices typically contain information that log: device user account session times and durations, device activity associated with user accounts, electronic storage media that connected with the device, and the IP addresses through which the device accessed networks and the internet.  Such information allows investigators to understand the chronological context of the electronic device or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within an electronic device or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on an electronic device may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within an electronic device may provide relevant insight into the device user's state of mind as it relates to the offense under investigation.  For example, information within the device may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the electronic device or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.      A person with appropriate familiarity with how an electronic device works can, after examining this forensic evidence in its proper context, draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

h.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an

accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, electronic device and storage medium evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device, or a storage medium, is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      i.     Further, in finding evidence of how an electronic device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

48.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of electronic device storage to human inspection to determine whether it is evidence described by the warrant.

## CONCLUSION

49.    Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that there has been a violation of Title 18, United States Code, §§ 2251 and 2252, which prohibits producing, advertising, promoting, presenting, distributing, possessing, or accessing with the intent to view, using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, child pornography/child sexual abuse material, and that evidence of those violations exist and are located on the electronic devices described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

/s/ Kimberly Kidd

Special Agent Kimberly Kidd
Federal Bureau of Investigation

Transmitted by email and attested to via telephone in accordance with the requirements of Fed. R. Crim. P. 4.1 on this 27 day of July, 2022.

Hon. Matthew A. Stinnett
UNITED STATES MAGISTRATE JUDGE

26